Shackelpoed, J.,
delivered the opinion of the Court.
This is a suit commenced in the Circuit Court of Davidson County, by Helen Shurer, administratrix of Charles Shurer, and her four minor children, who sue by her, as next Mend, to recover $8,000, and the interest thereon, being the amount of two. promissory notes, payable to the plaintiff, Helen Shurer, as the administratrix of Charles Shurer, which, it is alleged the defendant fraudulently obtained the possession of, by paying the same to an unauthorized agent, in Confederate currency. There are four counts in the declaration, setting forth these facts, to which the defendant pleads several pleas — that the notes were paid, and voluntarily delivered to the defendant.
A demurrer was filed; but, on the trial of the cause, all objections to the proceedings were withdrawn, and the cause submitted to the Court, upon the law and facts, waiving the intervention of a jury.
The facts are, substantially, as follows: Dr. Charles Shurer, a native of Germany, some twenty years ago, intermarried with Helen Tubbs, of the County- of De-Kalb, in this State. After his marriage, he settled in that county. He was possessed of considerable estate in Germany, and remittances of money were, from time to time, made to him.
*421 In 1859, lie received $5,000, which he deposited in the Bank of Tennessee, at Nashville. He died shortly after this deposit, intestate, leaving a widow and four children his heirs and distributees, who are the parties to this suit. In 1860, the defendant, Green, wishing to borrow $10,000, on long time, to place his son in business, knowing of this fund, applied to Judge M. M. Brien, the legal adviser and relative of the family, to procure a loan. Brien advised the loan; and to effect it, it was necessary, in order to draw the money from the bank, an administrator should be appointed upon the estate of Dr. Shurer; and, in pursuance of Brien’s instructions, Helen Shurer was appointed and qualified. To carry out the purposes, she gave to -her father, James Tubbs, a citizen of DeKalb County, Tenn., a power of attorney, to draw the money and make the loan. He came to Nashville, in pursuance of the previous understanding of the parties, drew from the bank $5,000, and loaned it to the defendant, Green, on the — day of --, 1860, taking his note at twelve months, payable to Helen Shurer, as admin-istratrix, with Thomas Eite, as security. She agreed to let him have the additional sum of $5,000, as soon as it was received from Germany. A short time thereafter, the money was received, and, on the — day of -, 1860, $3,000 was loaned in the same way, at twelve months. Green executed his note to Helen Shurer, as administratrix, with Fite as his security.
The notes were delivered to James Tubbs, the father of Helen. Green paid the interest at the ma *422 turity of the first note, about the last of December, 1860, or first of January following.
Shortly after the battle of Fishing Creek, in which the Confederate forces were defeated, and the Federal troops advancing upon Fort Donelson, the defendant sent Gr. D. Price, with the amount of the notes in Confederate currency, to DeKalb County, with instructions to pay off and take up the notes, including the .interest. Judge M. M. Brien, the legal adviser and relative of the family, was, at the time, a citizen and resident of Nashville. No notice or information was given him of their purposes. Price called on .James Tubbs, who, it appears, still retained the notes in his possession. Tubbs declined to receive the currency. Price insisted on paying them, stating that the money was good, that he would take it in the payment of his debts, and the time would soon come when the people would be compelled to take it. Mrs. Helen Shurer lived some distance from her father’s. Price left Tubbs without paying the notes, and returned in a few days, and, upon his urgent solicitation, the Confederate currency was received by Tubbs. Price, in his testimony, says he spoke of investing it in Confederate eight per cent, bonds. He advised him against this, as the Confederacy was not established. He then spoke of investing it in mountain lands. Price says Tubbs received the Confederate money voluntarily, and without threats or coercion on his part. At the time of the payment, the country was filled with rebel soldiers.
*423 When Mrs. Helen Shurer, the administratrix, was informed by her father, that he had received the Confederate currency, she told him he had done wrong in receiving it, and if she had been present, it should not have been done. The money was never received by her from her father. He loaned out about $4,000 of the currency, and has the notes, which the parties owing have refused to pay, and has the balance in his possession. There is no proof in the record that Mrs. Helen Shurer ever ratified the act of James Tubbs, in receiving the currency and delivering up the notes, other than the facts stated. Tubbs is a feeble old man, about eighty years of age. Upon the return of Price to Nashville, Judge Brien being informed of the transaction and payment, stated to the defendant, that the payment would not be recognized, and they would be compelled to pay the notes, upon the hearing of the case.
The Court was of opinion, the children of Dr. Shurer, the infant plaintiffs, were entitled to recover four-fifths of the money loaned, with the interest; that the plaintiff, Helen Shurer, having received the money through her agent, voluntarily, was not entitled to recover the share of one-fifth, to which she was entitled; from which judgment of the Court both parties have appealed to this Court.
The question for our consideration, is: Was the payment of these notes in Confederate currency to James Tubbs, who was the custodian of the notes, and the delivery of them to the agents of the defendants, such a payment and discharge of the debt, as will *424 bring the case ^ within the principles of the law, as settled by this Court, of an executed contract? Eor the solution of this question, it becomes necessary to look to the situation of the parties, to the circumstances that induced the loan, the motives that influenced the defendants to discharge the debt, and the circumstances surrounding the parties at the time the payment was made.
It is insisted for the defendant, that James Tubbs was the legal and authorized agent of the plaintiff, Helen Shurer, and, therefore, had a right to receive the money; and having received it, it thereby became an executed contract, and, under the ruling of this Court, that, though the payment was in illegal and unlawful currency, from public policy, the contract being executed, will not be disturbed. The proof shows, when the money was loaned, it was understood it was not to be paid, except the interest, until the children, who were then young, had arrived at age — the defendant, Green, stating he could get money at short time; but ■ wishing to place his son in business, he wanted it for a longer period.
To effect the loan, Judge M. M. Brien, the legal adviser of the family, was applied to, who favored it; and through his advice, Mrs. Helen Shurer was induced to administer on her husband’s estate; and, for the purpose of drawing the money from the bank, a power of attorney was given to James Tubbs, who drew the money, and, under the instruction of M. M. Brien, the money was loaned to the defendant, Green. It was thought at the time, Green being a man of fortune, a *425 good investment by the friends of the family. The notes taken were left in the possession of Tubbs.
Near the close of the year 1861, the tide of success of the Confederate arms, in this military district, commenced ebbing. The fortunes of war were against them. The battle of Fishing Creek had been lost, the Federal forces were advancing, and men became despondent. The country was filled with Confederate currency. Observing men saw the dangers ahead. 'Nashville, the residence of Green, was the focus of intelligence. The plaintiff and her father, James Tubbs, lived in a distant county, away from the lines of travel.
Though Judge M. M. Brien, the legal adviser of the family, through whom the loan had been effected, was a resident citizen of Nashville, without consulting him, or givingNiim any information as to his intention and purposes, an agent was dispatched to DeKalb County, to pay these notes, which, but a short time previous, was treated as a permanent loan. Why this haste to discharge the notes? Why was not the friend and adviser, Judge M. M. Brien, consulted, through whom the loan was procured? He was at Nashville, and was possessed of all the information relative to the condition of the country; knew of the defeat of the Confederate forces; could well see the storm that was about to sweep over the land.
No notice or information was given to him; but the agent is' posted to a county distant from Nashville, where the parties could not have been, in the nature of things, possessed of the same knowledge and condition of the country. James Tubbs refused, upon the appli *426 cation of the agent to pay the money, to receive it. He returned in a few days, and insisted upon his taking it. He stated that it was good, that he would take it for his debts, that the authorities intended to make it good, and -the people would have to take it. The currency was paid to Tubbs, and the notes delivered up to the defendant.
We think the acts of defendant, in procuring James Tubbs, who was the custodian of the notes, to receive the Confederate currency, amounts to a fraud in the sense of a court of equity: Story’s Equity, vol. 1, par. 207, and the authorities cited.
Was James Tubbs the agent of the plaintiff, and, as such, authorized to receive the payment of the notes? The authority to loan money, does not necessarily imply authority to collect: Story on Agency, sec. 98. It is insisted, if he was entrusted with the continual possession of the notes, it was' an implied authority to receive the money. This principle is recognized as correct; but, as an agent, he was not authorized to receive any other than lawful currency, that is convertible into money or coin: Story on Agency, sec. 181, and the authorities cited. To bind the principal, there must be an absolute payment of the money. The principle was settled by this Court, in the case of Stewart vs. Donally, 4 Yer., 177; 4 Hum., 44; 6 Hum., 62; Story on Agency, sec. 215; 2 Carter’s Ind., Rep., 324; 23 Ill. Rep., 470.
The payment, in this case, was in an unlawful and illegal currency, issued for a treasonable purpose. Defendant knew the purposes for which it was issued, *427 and in paying it to the agent, was guilty of an illegal act. It is insisted, that, though the payment was in an illegal currency, being an executed contract, upon principles of public policy, it would not be disturbed, if voluntarily made and without fraud. James Tubbs being the agent, the subsequent ratification of his act by the plaintiff, Helen Shurer, the administratrix, is binding upon her, and brings the case within the principles settled by this Court, of executed contracts. The principle stated is correct, under the rulings of this Court; but there is no proof in the record, that she ever ratified the acts of James Tubbs, as her agent, if he can be so regarded; but she, in express terms, repudiates them. She informed her father of her disapprobation of his acts, by stating: “You have done wrong; if I had been here, I should not have received it.” A daughter could not have said more to an aged and feeble father, in disaffirmance of his acts. She never received the Confederate currency from him. He, it appears, loaned out a part, and has about one-half of the Confederate currency paid to him, in his own possession.
The principle is well settled, in order to make the ratification of the act binding upon the principal, he must be fairly and fully informed of all the facts and circumstances of the matter which he has ratified: 23 Ill., R., 470; Iredell Equity R., 310. There being no proof of a ratification, or from which we can infer a ratification, on the part of Helen Shurer, the ad-ministratrix, she is not bound by the acts of her *428 father, James Tubbs, in receiving the Confederate currency, in the payment of these notes.
In view of ail the facts presented in this record, we are satisfied the defendants, in obtaining the possession of these notes, were guilty of a fraud, and were not thereby discharged of their liability, and are responsible for the amount of the notes thus fraudulently obtained, with the interest thereon. The principles of this case do not fall within the rule settled by this Court, of executed contracts. The notes having been thus improperly obtained, the administratrix, Helen Shurer, is entitled to maintain the action. The children of Charles Shurer, the distributees of the estate, are not proper parties, and are not entitled to recover. Upon the death of the intestate and the administration of Helen Shurer, the right to the personal estate vested in her. She had the right to sue for it, and, at the period of time fixed by law, distribute it to the next of kin; and, in prosecuting suits for the recovery of the assets, the distributees are not proper parties. Whether she had the right to loan the fund for more than two years, it is unnecessary for us to determine in the present case; but, if loaned for a longer time, the defendants could not avail themselves of that defense.
She might be responsible to the distributees for a devastavit, if the fund was lost. Upon a settlement of the estate, the notes could have been paid over by her to the guardian of the minors.
Other questions have been discussed in argument, *429 which, it is unnecessary to determine, as the questions settled are decisive of this case.
The judgment of the Circuit Court will he reversed; and the parties having waived all exceptions to the proceedings, and desiring this Court to render such judgment as is authorized by law and the facts of the case, we are of the opinion, that Helen Shurer, as the administratrix of Charles Shurer, is entitled to recover of the defendants, the amount of the notes with the interest thereon.